**E-FILED**
Wednesday, 30 December, 2015  12:26:14 PM
Clerk, U.S. District Court, ILCD

**IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

VICTOR JACKSON,
     Petitioner,

v.                    Case No. 2:14-CV-02012

UNITED STATES OF AMERICA,
     Respondent.

### Report and Recommendation

Before the Court is Petitioner's, Victor Jackson's, motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct a sentence by a person in federal custody. (D. 1)[1]. After U.S. District Judge Michael P. McCuskey denied Mr. Jackson's motion, the U.S. Court of Appeals for the Seventh Circuit issued Mr. Jackson a certificate of appealability on his claim that his counsel provided ineffective assistance by misinforming him that he would not be able to appeal an argument that he was eligible for sentencing under the Fair Sentencing Act if he pleaded guilty. Pursuant to that certificate, Mr. Jackson filed his opening appellate brief. Thereafter, Mr. Jackson and the government filed a joint motion for summary reversal and remand for an evidentiary hearing on the question presented in the certificate of appealability. The Court of Appeals granted that motion and remanded to this Court for an evidentiary hearing on "whether counsel provided ineffective assistance by misinforming Mr. Jackson that he would not be eligible for a Fair Sentencing reduction if he pleaded guilty." *Jackson v. United States*, 7th Circuit Case No. 14-2121, Docket No 26.

---

[1] Citations to the Docket in this case, 2:14-CV-02012, are "D. #", and citations to the Docket in the underlying criminal case, 2:10-CR-20038, are "R.#".

On remand, this matter was reassigned to Chief U.S. District Judge James E. Shadid, Judge McCuskey having retired in the time between his denial of Mr. Jackson's motion and the remand from the Court of Appeals. Chief Judge Shadid referred this matter to the undersigned to conduct the evidentiary hearing and issue a Report and Recommendation. The undersigned having now conducted that evidentiary hearing on December 11, 2015, the matter is ripe for a ruling. As set forth below, the undersigned RECOMMENDS that Mr. Jackson's motion be GRANTED.

## I
### A

On August 3, 2010, the Fair Sentencing Act ("FSA" or "Act") became law. Pub. L. No. 111-220, 124 Stat. 2372 (2010). The Act increased the drug amounts triggering mandatory minimums for crack trafficking offenses from 5 grams to 28 grams in respect to the 10-year mandatory minimum and from 50 grams to 280 grams in respect to the 10-year mandatory minimum. *Dorsey v. United States*, 132 S.Ct. 2321, 2329 (2012). The Act also instructed the United States Sentencing Commission to make such conforming amendments to the Federal Sentencing guidelines to conform to the new statutory drug quantity thresholds. *Id.*

Very quickly after the Act became law, an issue arose about to whom the Act applied. Some district courts held that the Fair Sentencing Act applied to everyone who was sentenced after the Act became law, even if a defendant's offense conduct occurred before that date.[2] Other courts, however, held that the

---

[2] *See United States v. Brown*, No. 09-cr-10281 (D. Mass. Mar. 28, 2011) (Gertner, J.); *United States v. Harris*, No. 09-cr-226, 2011 WL 1134983 (D. Minn. Mar. 25, 2011) (Tunheim, J.); *United States v. Foster*, No. 09-cr-35 (M.D. La. Mar. 25, 2011) (Brady, J.); *United States v. Beach*, No. 09-10132, 2011 WL 977766 (D. Kan. Mar. 17, 2011) (Melgren, J.); *United States v. Baltimore*, No. 3:09-cr-00032 (M.D. Tenn. Mar. 4, 2011) (Haynes, J.); *United States v. Holloman*, 765 F. Supp. 2d 1087 (C.D. Ill. 2011) (Mills, J.); *United States v. Newborn*, 09-cr-433 (D. Colo. Feb. 24, 2011) (Daniel, C.J.); *United States v. Hodges*, 765 F. Supp. 2d 1369 (M.D. Ga. 2011) (Sands, J.); *United States v. White*, No. 10-cr-00247, 2011 WL 587100 (D. S.C. Feb. 9, 2011) (Anderson, Jr., J.); *United States v. McKenzie*, No. 2:10-cr-00079 (E.D. Wash. Feb. 9, 2011) (Peterson, C.J.); *United States v. Jackson*, No.

Act only applied to those defendants whose *conduct* occurred after the Act

became law, even if they were sentenced after the Act's effective date. [3] No U.S.

1:10-cr-20 (N.D. Fla. Feb. 7, 2011) (Mickle, C.J.); *United States v. Robinson*, 763 F. Supp. 2d 949 (E.D. Tenn. 2011) (Collier, C.J.); *United States v. Rolle*, No. 09-cr-103 (M.D. Fla. Feb. 4, 2011) (Antoon, J.); *United States v. Elder*, No 10-cr-132, 2011 WL 294507 (N.D. Ga. Jan. 27, 2011) (Story, J.); *United States v. Francis*, No. 08-cr-271 (M.D. Fla. Jan. 26, 2011) (Scriven, J.); *United States v. Duncan*, No. 10-cr-0089 (E.D. Wash. Jan. 26, 2011) (Nielsen, J.); *United States v. Cruz*, No. 10-cr-613 (N.D. Ill. Jan. 20, 2011) (Conlon, J.); *United States v. Cox*, No. 10-cr-85, 2011 WL 92071 (W.D. Wis. Jan. 11, 2011) (Conley, J.); *United States v. Vreen*, No. 10-cr-119 (M.D. Fla. Jan. 10, 2011) (Conway, C.J.); *United States v. Green*, No. 08-cr-270 (M.D. Fla. Jan. 7, 2011) (Presnell, J.); *United States v. Watts*, No. 09-cr-30030 (D. Mass. Jan. 21, 2011) (Ponsor, J.); *United States v. Johnson*, No. 08-cr-270, 2011 WL 10819912 (M.D. Fla. Jan. 4, 2011) (Presnell, J.); *United States v. Jones*, No. 4:10-cr-00233 (N.D. Ohio Jan. 3, 2011) (Dowd, J.); *United States v. English*, 757 F. Supp. 2d 900 (S.D. Iowa 2010) (Pratt, C.J.); *United States v. Parks*, No. 10-cr-225, 2010 WL 5463743 (D. Neb. Dec. 28, 2010) (Bataillon, C.J.); *United States v. Curl*, No. 09-cr-734 (C.D. Cal. Dec.    22, 2010) (Wright, J.); *United States v. Whitfield*, No.10-cr-00013 (N.D. Miss. Dec. 21, 2010) (Mills, J.); *United States v. Holloway*, No. 04-cr-00090 (S.D. W. Va. Dec. 20, 2010) (Chambers, J.); *United States v. Ross*, 755 F. Supp. 2d 1261 (S.D. Fla. 2010) (King, J.); *United States v. Gutierrez*, No. 06-cr-40043 (D. Mass. Dec. 17, 2010) (Saylor, J.); *United States v. Johnson*, No. 10-cr-00138 (E.D. Va. Dec. 6, 2010) (Payne, J.); *United States v. Gillam*, 753 F. Supp. 2d 683 (W.D. Mich. 2010) (Neff, J.); *United States v. Spencer*, No. 09-cr-00400 (N.D. Cal. Nov. 30, 2010) (Ware, J.); *United States v. Jaimespimentz*, No. 09-cr-488 (E.D. Pa. Nov. 24, 2010) (Baylson, J.); *United States v. Favors*, No. 10-cr-00384 (W.D. Tex. Nov. 23, 2010) (Yeakel, J.); *United States v. Carter*, No. 08-cr-299 (N.D.N.Y. Nov. 22, 2010) (Scullin, J.); *United States v. Garcia*, No. 09-cr-1054 (S.D.N.Y. Nov. 15, 2010) (Scheindlin, J.); *United States v. Shelby*, No. 09-cr-00379 (E.D. La. Nov. 10, 2010) (Barbier, J.); *United States v. Angelo*, No. 10-cr-10004 (D. Mass. Oct. 29, 2010) (Zobel, J.); *United States v. Douglas*, 746 F. Supp. 2d 220 (D. Me. 2010) (Hornby, J.), *aff'd*, 644 F.3d 39 (1st    Cir. 2011) (Boudin, J.); *United States v. Dixson*, No. 08-cr-00360 (M.D. Fla. Aug. 24, 2010) (Covington, J.).

[3] *See, e.g.*, *United States v. Douglas*, No. 10–945, 2011 WL 1225666 (D.S.C. Mar. 31, 2011); *United States v. Young*, 782 F. Supp. 2d 450 (E.D. Mich. 2011); *United States v. Davis*, 781 F. Supp. 2d 834 (N.D. Iowa 2011); *United States v. Nash*, No. 10– 20320, 2011 WL 891148 (E.D. Mich. Mar. 11, 2011); *United States v. Wright*, No. 10–20185, 2011 WL 806219 (E.D. Mich. Mar. 2, 2011); *United States v. Peterson*,  774 F. Supp. 2d 1024 (D.N.D. 2011); *United States v. Reddick*, No. 10-cr-20064, 2011 WL 768306 (E.D. Mich. Feb. 28, 2011); *United States v. Campbell*, 767 F. Supp. 2d 873 (E.D. Tenn. 2011); *United States v. Gadson*, No. 08-cr-248, 2011 WL 542433 (W.D. Pa. Feb. 8, 2011); *United States v. Wilks*, No. 10-cr-30134, 2011 WL 499949 (S.D. Ill. Feb. 4, 2011); *United States v. Franklin*, No. 10-cr-20467, 2011 WL 346085 (E.D. Mich. Feb. 3, 2011); *United States v. Santana*, 761 F. Supp. 2d 131 (S.D.N.Y. 2011); *United States v. Johnson*, No. 09-cr-373, 2011 WL 39090 (E.D. La. Jan. 4, 2011); *United States v. Dickey*, 759 F, Supp. 2d 654 (W.D. Pa. 2011), *vacated*, 459 F. App'x 96 (3d Cir. 2012); *United States v. Davis*, No. 10-cr-036, 2011 WL 39094 (E.D. La. Jan. 3, 2011); *United States v. Patterson*, No. 10-cr-94, 2010 WL 5480838 (S.D.N.Y. Dec. 30, 2010); *United States v. Burgess*, No 09-cr-150, 2010 WL 5437265 (W.D. Pa. Dec. 27, 2010); *United States v. Jesus–Nunez*, No. 10-cr-017, 2010 WL 5422604 (M.D. Pa. Dec. 27, 2010); *United States v. Lightfoot*, No. 10-cr-42, 2010 WL 5300890 (E.D. Va. Dec. 22, 2010); *United States v. Crews*, 755 F. Supp. 2d 666 (W.D. Pa. 2010); *United States v. Mobery*, No. 09-cr-0445 (D. Md. Dec. 15, 2010) (Chasanow, C.J.); *United States v. Tejeda*, 824 F. Supp. 2d 473 (S.D.N.Y. 2010); *see also United States v. Barnett*, No. 09-cr-0244 (D. Md. Feb. 10, 2011) (Blake, J.); *United States v. Buckner*, No. 10-cr-46 (E.D. Tenn. Mar. 1, 2011) (Greer, J.); *United States v. Muller*, No. 09-cr-00247 (D. Conn. Mar. 30, 2011) (Chatigny, J.); *United States v. Wolford*, No. 08-cr-29 (W.D. Pa. Mar. 30, 2011) (Cohill, J.); *United States v. Williams*, No. 10-cr-00041 (M.D. Fla. Feb. 28, 2011) (Whittemore, J.).

Circuit Court of Appeals had weighed in on this question until March 11, 2011, when the Seventh Circuit sided with those district courts which held that the Act only applied to defendants whose offense conduct occurred after the Act became law. *United States v. Fisher*, 635 F.3d 336 (7th Cir. 2011), *reversed by Dorsey*, 132 S.Ct. 2321 (2012).

Notwithstanding the binding precedent created by *Fisher* in the Seventh Circuit, the growing split among the district courts on the applicability of the Act created the possibility that the U.S. Supreme Court would decide the issue at some point, which it in fact did after it granted a writ of *certiorari* in *Dorsey*, which was the companion case to *Fisher* in the Seventh Circuit. No doubt recognizing the fluid state of the law in this area and the uncertainty created by the split among the lower courts, the U.S. Attorney's Office for the Central District of Illinois allowed defendants during this time to enter into conditional pleas pursuant to plea agreements which expressly reserved a defendant's right to challenge on appeal the denial of a request to apply the Act to them at sentencing.[4]  The Supreme Court eventually decided in *Dorsey* that the Act applied to defendants sentenced after its effective date, regardless of when their offense conduct occurred, thereby making relief available to any defendant who had not waived the issue and whose case was not final before the Court issued its opinion.

**B**

The prosecution of Mr. Jackson took place within the context of these legal events. Specifically, a grand jury indicted Mr. Jackson on June 10, 2010, on three counts of distributing 5 grams or more of crack cocaine in violation of 21 U.S.C.

---

[4] At the evidentiary hearing before this Court, both parties agreed that, as a matter of fact, the U.S. Attorney's Office for the Central District of Illinois had a policy allowing defendants who pleaded guilty pursuant to a plea agreement to preserve the right to argue on appeal that the FSA applied to their cases.

§§ 841(a)(1) and 841(b)(1)(B). All of the offense conduct was alleged to have occurred before the effective date of the Fair Sentencing Act, August 3, 2010. Pub. L. No. 111-220, 124 Stat. 2372 (2010). In the same indictment, the grand jury also charged co-defendant Daniel Kelly in Count One only. (R. 7). On June 2, 2010, the Court appointed attorney Bruce Ratcliffe to represent Mr. Jackson.

Co-defendant Kelly entered a conditional plea pursuant to a written plea agreement with the government wherein he specifically reserved his right to argue on appeal that the Fair Sentencing Act applied to him given that, although his offense conduct occurred prior to the effective date of the Act, he would be sentenced after it. Specifically, on March 24, 2011, before entering his plea, Mr. Kelly's attorney filed a document entitled, "SENTENCING MEMORANDUM PURSUANT TO THE FAIR SENTENCING ACT OF 2010 AND OBJECTION TO BEING SENTENCED PER THE LAW REGARDING CRACK COCAINE EXISTING BEFORE AUGUST 3, 2010." (R. 27).   He thereafter entered a conditional plea of guilty with a plea agreement pursuant to Federal Rules of Criminal Procedure 11(c)(1)(C) and 11(a)(2). Consistent with the policy of the U.S. Attorney's Office in the Central District of Illinois at the time, Mr. Kelly's plea agreement reserved his right to "appeal a decision by this Court holding that the Fair Sentencing Act of 2010, Pub. L. No. 111-220, is not retroactive and does not apply to the defendant's case," notwithstanding a waiver of his right to appeal all other sentencing issues. (R. 28 at ECF p. 11). The plea agreement also specifically stated that "[t]he defendant, with the consent of the United States, reserves the right to appeal the Court's denial of the defendant's Motion to be Sentenced Pursuant to the Fair Sentencing Act of 2010." *Id.* Because of Mr. Kelly's timely plea, he received a 3-level reduction in his Offense Level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. (R. 59 at ECF pp. 7-8).

Mr. Jackson's case took a different course. Rather than plead guilty, Mr. Jackson proceeded to a jury trial on all counts. The jury convicted Mr. Jackson on Counts One and Two of the Indictment, but the jury deadlocked on Count Three, with Judge McCuskey declaring a mistrial on that count. Having elected to try his case before a jury, Mr. Jackson did not receive the benefit of a 3-level reduction for acceptance of responsibility. (R. 62 at ECF p. 7). Being a Career Offender, his guideline range without acceptance of responsibility was 360 months to life imprisonment, whereas with the 3-level reduction, his range (without applying the FSA) would have been 262 to 327 months.

Judge McCuskey sentenced Mr. Jackson to the bottom of the range, *i.e.* 360 months. Unlike Mr. Kelly's attorney, at no time did Mr. Jackson's counsel attempt to preserve an argument for appeal that the Fair Sentencing Act applied to him, which if applied would have lowered his guideline range to 262 to 327 months imprisonment even without a reduction for acceptance of responsibility. Indeed, Mr. Jackson's attorney filed nothing related to FSA and did not mention the FSA at sentencing. (R. 87).

## C

Both Mr. Jackson (with new counsel) and Mr. Kelly appealed to the Seventh Circuit, arguing that the FSA should have applied to their cases at sentencing, with Mr. Jackson also challenging his convictions. (R. 93 at ECF p. 4). The Court of Appeals vacated both sentences and remanded for resentencing under the rules established in the FSA, although it affirmed Mr. Jackson's convictions. Id at ECF p. 5. Specifically, while the appeal was pending, the U.S. Supreme Court decided *Dorsey* which, as already noted, disagreed with the Seventh Circuit's decision in *Fisher* and held that the FSA applied to all defendants sentenced after the Act's effective date, regardless of when their offense conduct occurred. *Dorsey,* 132 S.Ct. at 2335.

6

In vacating Mr. Jackson's and Mr. Kelly's sentences, the Court of Appeals noted a difference in procedural postures of the cases. The court stated that Mr. Kelly "properly raised this issue in the district court, which refused to apply the Act based on the then-prevailing law of the circuit. Mr. Kelly is therefore entitled to be resentenced." (R. 93 at ECF p. 4). Regarding Mr. Jackson, however, the court noted that he "did not raise this issue in the district court and so was sentenced under the pre-Fair Sentencing Act rules. Our review of his sentence is for plain error only." *Id.* Fortunately for Mr. Jackson, the court held that even on plain error review, the error made at sentencing required correction. *Id.*

On remand for resentencing (also with new counsel), everyone agreed that Mr. Jackson's new guideline range was 262 to 327 months. (R. 110 at ECF p. 13). Like at his original sentencing hearing, this range did not include a 3-level reduction for acceptance of responsibility. *Id.* Judge McCuskey ultimately sentenced Mr. Jackson to 200 months imprisonment, a 62-month variance from the bottom of the guideline range due to Mr. Jackson's "rehabilitative potential." (R. 110 at ECF p. 30).

## D

After Mr. Jackson's resentencing under the FSA and *Dorsey*, he filed the motion currently pending before the Court. Among other arguments, Mr. Jackson argues that Mr. Ratcliffe provided ineffective assistance to him by misadvising him that the only way for him to preserve an argument for appeal that the FSA applied to him was if he went to trial. (D. 1 at ECF p. 4). Without appointing counsel and without a hearing, Judge McCuskey denied Mr. Jackson's petition in its entirety, as well as declined to issue a certificate of appealability. (D. 6). Mr. Jackson appealed, the Court of Appeals granted a certificate of appealability, and the court appointed counsel. (7th Circuit Docket, No. 14-212, Dkt No. 8). The court found that "Mr. Jackson has made a substantial

showing of the denial of a constitutional right as to whether counsel provided ineffective assistance by misinforming Mr. Jackson that he would not be eligible for a Fair Sentencing Act reduction if he pleaded guilty. *See Dorsey v. United States*, 132 S.Ct. 2321 (2012). *See* 28 U.S.C. § 2253(c)(2)." *Id* (citations in original). Eventually, both parties filed a joint motion for remand, agreeing an evidentiary hearing was necessary on the issue. *Id.* at 23. Pursuant to that motion, the Court of Appeals remanded for that sole purpose. *Id.* at 26.

The gravamen of Mr. Jackson's claim is that but for his attorney's incorrect advice regarding the necessity of proceeding to trial to preserve his FSA issue for appeal, he would have pleaded guilty. Moreover, because he went to trial rather than plead guilty because of his counsel's incorrect advice, he lost the 3-level reduction for acceptance of responsibility. (D. 34 at ECF p. 9). According to Mr. Jackson, this loss of acceptance of responsibility prejudiced him because, had he pleaded guilty and received a reduction for acceptance of responsibility, his post-*Dorsey* guideline range would have been 188 to 235 months imprisonment. (D. 34 at ECF pp. 18-19). Thus, even ignoring the variance from the bottom of his guideline range that Mr. Jackson received at his post-*Dorsey* resentencing, a bottom of the range sentence which included a reduction for acceptance of responsibility would have been twelve months lower than the 200-month sentence he in fact received. The government essentially responds that the evidence presented at the hearing belies Mr. Jackson's claim of deficient performance and that, even assuming deficient performance, he still would have pleaded guilty rather than having proceeded to trial absent the deficient performance, and he cannot, therefore, demonstrate prejudice. (D. 31 at ECF p. 4).

**II**

**A**

At the December 11, 2015 evidentiary hearing, the government offered three exhibits, entered into evidence without objection.  Specifically, throughout the course of Mr. Jackson's case, he wrote a number of letters to Judge McCuskey with various complaints about Mr. Ratcliffe.  Mr. Jackson wrote the first such letter on November 30, 2010. (Government Exhibit 1; R. 21). In that letter, Mr. Jackson complained that he had not received responses from Mr. Ratcliffe regarding motions Mr. Jackson wanted filed in his case (R. 21). Attached to his letter to Judge McCuskey was a letter he wrote to Mr. Ratcliffe on October 25, 2010, wherein he asked his attorney to file a number of motions. (R. 21-1).  On February 16, 2011, Mr. Jackson again wrote Judge McCuskey, informing him that Mr. Jackson's mother might hire National Legal Professional Associates (N.L.P.A) to assist his attorney with representing him. (Government Exhibit 2; R. 23).

On April 13, 2011, the Court docketed another packet of letters sent from Mr. Jackson. This packet included a letter dated February 28, 2011 from Mr. Jackson to Mr. Ratcliffe, wherein he again provided Mr. Ratcliffe with a list of motions he wanted his attorney to file. (Government Exhibit 3; R. 40; R. 40-1). Mr. Jackson followed this letter with another letter to Mr. Ratcliffe, dated March 6, 2011, wherein he asked his attorney to file a motion "or whatever needs to be done regarding the wording in my Criminal Complaint." (R. 40-1).

Then, on March 27, 2011, Mr. Jackson wrote a four-page letter to Judge McCuskey, complaining at length about Mr. Ratcliffe. Twice in this letter he complains that Mr. Ratcliffe was attempting to coerce Mr. Jackson into pleading guilty instead of going to trial. Specifically, Mr. Jackson wrote:

> From the day of our initial visit, he has been pushing me to the point of borderline coercion, (not advising) to plead guilty. It is my right to choose the approach I feel is the best in attaining the greatest outcome for my case. He should help represent and navigate me in that avenue to the best of his abilities regardless of whether he agree[sic] with my decision or not.

(R. 40-1 at ECF p. 2). Later in the letter, referencing a meeting he had with Mr. Ratcliffe on March 16, 2011, he stated:

> Finally, on 3/16/11 Mr. Ratcliffe visited with me but to my dismay, I was met with a combative and hostile attitude from him because I would not adhere to his demand to plead guilty, clearly not the route I want to take.

(R. 40-1 at ECF p. 5). Mr. Jackson also complained that Mr. Ratcliffe refused to file any of the motions he previously requested and that Mr. Ratcliffe refused to work with the N.L.P.A. Mr. Jackson also complained that he had not yet had an opportunity to examine lab reports, discovery, police reports, surveillance tapes, criminal complaints, search warrants, arrest warrants or "any other valuable information for my defense." (R. 40-1 at ECF pp. 2-3). Mr. Jackson concluded by asking that Judge McCuskey "consider my situation and give me some strong advise or advise Mr. Ratcliffe the importance of maintaining professionalism in this arena." (R. 40-1 at ECF pp. 4-5).

The FSA is not mentioned in any of the letters or exhibits introduced by the Government.

## B

Three witnesses testified at the evidentiary hearing: Mr. Jackson, Mr. Kelly, and Mr. Ratcliffe.

Mr. Jackson testified that around two months after his arrest in the Spring of 2010, he first became aware of the Fair Sentencing Act through a petition passed around at the jail. This petition was intended to be given to family

members who, in turn, would give it to members of Congress in an attempt to persuade them to pass the Act into law. The inmates where Mr. Jackson was detained frequently discussed the Act, and Mr. Jackson raised the issue of the FSA with Mr. Ratcliffe.  When he did so, Mr. Ratcliffe did not seem to know what it was, but he said he would look into it.

Sometime later, according to Mr. Jackson's testimony, after Mr. Ratcliffe looked into the issue, Mr. Ratcliffe advised him that he would not be able to preserve the issue for appeal unless he went to trial. Regarding Mr. Jackson's statement to Judge McCuskey in his letter of March 27, 2011 that his attorney was using "borderline coercion" to persuade him to plead guilty, Mr. Jackson said that he was trying to give the judge an understanding that his lawyer had stated to him that he had to go to trial to preserve an FSA issue.

Mr. Jackson also testified that prior to a February 25, 2011 status hearing, he was in the federal courthouse with Mr. Kelly. Mr. Kelly told Mr. Jackson that he intended to enter a conditional plea in which he would reserve his right to appeal the FSA issue. Mr. Jackson then asked Mr. Ratcliffe about entering into a plea to reserve his right to raise the FSA issue on appeal, but, according to Mr. Jackson, Mr. Ratcliffe reiterated his belief that the right could not be preserved in a plea agreement.  Mr. Jackson also testified that had Mr. Ratcliffe advised him about taking a conditional plea which preserved the right to appeal the FSA issue, he would have entered into such a plea and not gone to trial.

Regarding the possibility of entering into an open plea without a plea agreement, which would not waive any FSA sentencing argument, Mr. Jackson's testimony under questioning by the prosecutor made it clear that he did not understand the difference between a conditional and an open plea.

### C

Co-defendant Kelly also testified at the hearing. Mr. Kelly testified that, on the advice of his attorney, he entered into a conditional plea wherein he reserved his right to argue on appeal that the FSA applied to his case at sentencing. He also testified that on February 25, 2011, while both he and Mr. Jackson were at the courthouse for status hearings, Mr. Kelly told Mr. Jackson that his lawyer told him he could enter into a plea agreement and still preserve his right to argue on appeal that the FSA applied to him. In response, Mr. Jackson said that this route sounded like a good idea and that he would talk to his lawyer about it.

### D

Mr. Ratcliffe testified at the hearing that he received his law license in 1983 and was admitted to practice in federal court in 1986. As a member of the CJA Panel for the Central District of Illinois, he recalled having approximately six appointments to cases. During the time period in question in this case, however, Mr. Jackson's case was the only federal drug case he had.

After his appointment to represent Mr. Jackson, he obtained the discovery from the government, visited Mr. Jackson, and began to go over the discovery with him.  He informed Mr. Jackson that from a defense point of view, his case was a difficult one and a jury would more likely convict him than not. He therefore advised him that he would be better served if he entered into a plea. Mr. Jackson, however, was adamant about his desire to proceed to trial. Therefore, although Mr. Ratcliffe had informal discussions with the prosecutor about a plea, no formal plea agreement was sought in light of Mr. Jackson's desire to go to trial.

Regarding the FSA, Mr. Ratcliffe and Mr. Jackson had a number of conversations about the Act, and Mr. Jackson was very concerned about it. Indeed, Mr. Jackson first brought the FSA to Mr. Ratcliffe's attention, who said

he would "study up" on it. Specifically, Mr. Jackson was concerned about losing his rights to application of the FSA. In response, Mr. Ratcliffe testified that he told Mr. Jackson the following:

> There are certain rights that are given up in a formal plea agreements; but because of the retroactivity application of the Fair Sentencing Act if it were to be applied in his benefit, it would apply regardless of the plea agreement because retroactivity means retroactivity, and it would have to apply to him as it would apply to others who may not have been given the benefit of that type of preservation of that aspect of the plea agreement.

(12/11/2015 Rough Draft Hearing Transcript ("Tr. #), p. 49). He also explained that Mr. Jackson could plead guilty without a plea agreement which would not waive any arguments he wished to make at sentencing, but Mr. Jackson rejected that idea as well.

Regarding Mr. Kelly's plea, Mr. Ratcliffe was unaware of the specifics of that plea agreement and never had any discussions with Mr. Jackson about the specifics of Mr. Kelly's plea, including anything about the FSA issue preservation contained in that agreement. Although the government had never presented Mr. Ratcliffe or any of his former clients with a conditional plea offer before, he was aware that Mr. Kelly's plea was conditional. However, he explored no such conditional plea with the government for Mr. Jackson because he wanted to go to trial rather than plead guilty. Mr. Ratcliffe also testified that he never advised Mr. Jackson that he had to go to trial to preserve an FSA issue.

Finally, Mr. Ratcliffe testified that he had no contemporaneously created notes from his conversations with Mr. Jackson during the course of his representation of him.

### III

### A

The legal standard applicable to this case is well-established. Specifically, to prevail on his claim of ineffective assistance of counsel, Mr. Jackson must show that his attorney's performance was objectively unreasonable and that such performance prejudiced him. *See, e.g., Hill v. Lockhart,* 474 U.S. 52, 57 (1985); *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984). Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Galowski v. Berge,* 78 F.3d 1176, 1180 (7th Cir. 1996). A petitioner will prevail only by demonstrating a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In this case, Mr. Jackson alleges that poor counsel about the Fair Sentencing Act led him to go to trial rather than plead guilty. As a result he "must show not only that Atty. [Ratcliffe] acted in error" but also that "had Atty. [Ratcliffe] provided competent advice, there is a reasonable probability that [a plea] would have been presented to the court, that the court would have accepted it, and that the . . . sentence . . . would have been less severe than the judgment imposed." *Foster v. United States,* 735 F.3d 561, 566 (7th Cir. 2013) (citing *Lafler v. Cooper,* ___ U.S. ___, 132 S.Ct. 1376, 1384-85 (2012)).

### B

Turning to the question of deficient performance first, the Court finds that Mr. Jackson has "overcome the presumption that counsel's performance falls within the wide range of reasonable professional assistance." *Galowski,* 78 F.3d at 1180.

As an initial matter, the Court notes that if Mr. Ratcliffe informed Mr. Jackson that he could only preserve his right to argue on appeal that  the FSA

14

applied to his case by going to trial, such advice would have been deficient performance. Both an "open plea" without a plea agreement and a conditional plea, as being offered by the government to defendants at the time in question, would have allowed for the preservation of the FSA issue for appeal.[5] *See United States v. Adams*, 746 F.3d 734, n. 8 (7th Cir. 2014)("a blind plea of guilty does not waive a defendant's right to appeal his sentence"). Advising a client otherwise, as Mr. Jackson claims, would clearly have been incorrect and deficient performance.

Mr. Ratcliffe testified that he never advised Mr. Jackson that he could only preserve an FSA issue by going to trial, but there are a number of troubling aspects to Mr. Ratcliffe's testimony.

### 1

First, much of Mr. Ratcliffe's testimony was vague and confused, exacerbated no doubt by the fact that he kept no contemporaneously created notes of his conversations with Mr. Jackson during the course of his representation, which lasted for over a year. The Court specifically asked Mr. Ratcliffe if he had such notes, to which Mr. Ratcliffe responded, "No, I don't." (Tr. 77). Accordingly, all of Mr. Ratcliffe's testimony came only from his unrefreshed recollection of events, which occurred around five years ago. How an attorney can adequately represent a defendant without taking notes of his meetings and conversations with his client is difficult for the Court to fathom.

---

[5] The government's policy to allow the use of "conditional pleas" to preserve the FSA issue is puzzling. A conditional plea preserves a defendant's right to challenge pretrial motions related to the guilt phase of a case. *See* Fed. R. Crim. P. 11(a)(2); *Adams,* 746 F.3d at 739. The applicability of the FSA is a *sentencing* issue. Accordingly, a conditional plea was unnecessary to preserve a defendant's right to raise the FSA issue; rather, the sentencing issue appeal waiver provision in a plea agreement, such as the one in Mr. Kelly's, needed only to make explicit that the waiver did not apply to the FSA issue. A conditional plea was unnecessary, although also harmless.

An example of the confusing nature of Mr. Ratcliffe's testimony is his response to the prosecutor's question about an informal offer to the low end of the guideline range made by Mr. Jackson's prosecutor at the time, Ms. Coleman. Mr. Ratcliffe stated that he did not "have a specific recollection of it. . .," (Tr. 47) but that he "would" have communicated the offer to Mr. Jackson and that "he rejected it. Yes." (Tr. 47-78). Recollecting with certainty that Mr. Jackson rejected an offer which Mr. Ratcliffe didn't specifically recollect receiving is a conflation of what Mr. Ratcliffe believed he *would do* with what he actually *did do* and calls into question his memory of events in general.

Mr. Ratcliffe also testified that he was unaware of the specifics of Mr. Kelly's plea agreement, although he was generally aware of its terms from discussions with the prosecutor, Ms. Coleman. (Tr. 50). However, Mr. Kelly's plea agreement was entered on the public docket in both Mr. Jackson's and Mr. Kelly's case on March 31, 2011. (R. 28). Mr. Ratcliffe received electronic notice of the filing of the plea agreement and access to it as counsel of record in the case for Mr. Jackson. Accordingly, he either never read the document or does not now recall doing so. A failure to read the document on the part of Mr. Ratcliffe is particularly troubling, especially in light of his testimony that he was concerned that Mr. Kelly's plea would turn him into a witness against Mr. Jackson. (Tr. 50). Where better to investigate this question than the plea agreement? This failure to examine Mr. Kelly's plea agreement might also explain Mr. Ratcliffe's testimony that he was neither familiar with Federal Rule of Criminal Procedure 11(a)(2) nor had "an understanding of what a conditional plea agreement covers." (Tr. 68). Had he read Mr. Kelly's plea agreement, he would be familiar with both.

Mr. Ratcliffe also testified that he never discussed the specifics of Mr. Kelly's plea agreement with Mr. Jackson, nor did he discuss the Fair Sentencing Act provision contained therein. (Tr. 50-51). However, he also testified that Mr.

16

Jackson was "greatly concerned about losing any potential rights about this particular aspect of, of his case [the FSA], that he would not lose those rights pursuant to a plea." (Tr. 48). Likewise, he testified that "[w]e had a number of conversations about the Fair Sentencing Act. He was very concerned about it," (Tr. 48) and that he spent "hours, literally hours, discussing pleas, trials, probable results from each, the preservation of the Fair Sentencing Act." (Tr. 69). It is incredible to this Court, given the undisputed testimony that Mr. Jackson was greatly concerned about preserving the FSA issue, that Mr. Jackson and Mr. Ratcliffe would not have at least discussed the preservation of the FSA issue in Mr. Kelly's plea agreement generally, especially in light of the undisputed, corroborated testimony that at least Mr. Jackson, if not Mr. Ratcliffe, became aware on February 25, 2011 of the conditional plea into which Mr. Kelly would enter, which preserved the FSA issue.

## 2

Mr. Ratcliffe's testimony also demonstrates that he was in fact "at sea" on the Fair Sentencing Act and its surrounding issues at the time he represented Mr. Jackson. For example, Mr. Ratcliffe candidly acknowledged that the potential for an FSA issue was first brought to his attention by Mr. Jackson, just as Mr. Jackson testified. As noted in Mr. Jackson's pre-hearing memorandum, the FSA was very much in the spotlight of both legal professionals and the public at large. (D. 34 at ECF pp. 13-14). The fact that Mr. Jackson had to bring the potential applicability of the FSA to the attention of his attorney turns the attorney-client relationship on its head.

Next, even accepting as true Mr. Ratcliffe's testimony concerning the advice he gave Mr. Jackson about preserving an FSA issue for appeal, that advice was *incorrect*. Mr. Ratcliffe testified:

> There are certain rights that are given up in a formal plea agreements; but because of the retroactivity application of the Fair Sentencing Act if it were to be applied in his benefit, it would apply regardless of the plea agreement because retroactivity means retroactivity, and it would have to apply to him as it would apply to others who may not have been given the benefit of that type of preservation of that aspect of the plea agreement.

(12/11/2015 Rough Draft Hearing Transcript ("Tr. #"), p. 49). When asked to explain this response by the Court, Mr. Ratcliffe indicated that he believed that if the FSA were found to be retroactive as the issue was being debated at the time, it would apply to Mr. Jackson regardless of whether he entered into an open plea, a conditional plea, or a plea with an appeal waiver. (Tr. 75-76).

Critically, a plea agreement with a general waiver of a defendant's right to appeal his sentence *would not* have preserved the right to argue on appeal that the FSA should apply to a sentence. A general waiver of a defendant's sentencing appeal rights would include a waiver of an FSA argument. *See United States v. Sines*, 303 F.3d 793, 798 (7th Cir. 2002) ("effective waiver extinguishes the claim of error and precludes appellate review"). Had Mr. Jackson entered into a plea agreement with a general waiver of his right to appeal his sentence without a specific exception preserving the FSA issue, he would have waived his right to appeal that issue, contrary to Mr. Ratcliffe's advice. Were it otherwise, there would be no need for defendants to have specific exceptions in their sentencing appeal waivers preserving the FSA issue, as Mr. Kelly's sentencing appeal waiver did. *See also e.g., United States v. Bailey*, 777 F.3d 904, 905-06 (7th Cir. 2015).

Finally, and most troubling of all, Mr. Ratcliffe never preserved the FSA issue. It is undisputed that Mr. Jackson was very concerned about the FSA and preserving his right to argue on appeal that it applied to him; the only dispute is whether he was incorrectly advised that he had to go to trial to preserve that

18

right. Mr. Jackson having gone to trial, Mr. Ratcliffe filed *nothing* related to the FSA. He filed no motion seeking to preserve the FSA issue, unlike Mr. Kelly's counsel, who filed a sentencing memorandum seeking to preserve the issue. (R. 27). A simple one-sentence motion adopting Mr. Kelly's memorandum would have sufficed to preserve the issue, but Mr. Ratcliffe filed no such motion. Or, Mr. Ratcliffe could have filed his own sentencing memorandum raising the FSA issue, but he did not. Indeed, he filed no sentencing memoarndum at all. Finally, Mr. Ratcliffe could have orally preserved the FSA issue at Mr. Jackson's sentencing hearing, but again he did nothing. He never mentioned the FSA at the sentencing hearing. Accordingly, after numerous discussions about the FSA and Mr. Jackson's undisputed desire to preserve the issue for appeal, Mr. Ratcliffe failed to preserve the issue in any way. The Seventh Circuit noted this failure in its Order after the appeals in Mr. Jackson's and Mr. Kelly's cases, pointing out that Mr. Kelly had preserved the issue and Mr. Jackson had not. (R. 93 at ECF p. 4). Fortunately for Mr. Jackson, notwithstanding the lack of preservation, the Seventh Circuit reviewed Mr. Jackson's case under the plain error standard of review and remanded for resentencing under the FSA. But a remand on an FSA issue on plain error review was far from guaranteed, *see United States v. Hible*, 700 F.3d 958, 961 (7th Cir. 2012)(denying defendant relief under the FSA due to a waiver of the issue in the court below), and there could be no strategic reason to fail to preserve the FSA issue here, where Mr. Jackson had repeatedly discussed the issue with his counsel.

**3**

   None of the issues addressed above concerning Mr. Ratcliffe's testimony and performance in representing Mr. Jackson directly address the central question in this case, *i.e.,* whether Mr. Ratcliffe incorrectly advised Mr. Jackson that he could only preserve the FSA issue for appeal by going to trial, rather than

entering a plea of some type. However, these issues do undermine the reliability of Mr. Ratcliffe's testimony regarding his memory and advice concerning the FSA generally. The combination of Mr. Ratcliffe's failure to keep any notes of his conversations with Mr. Jackson, the conflation of what he "would do" with what he actually did in this case, the misunderstanding of the effect of a sentencing appeal waiver in general on preservation of an FSA issue, and the complete failure to preserve the FSA issue in the district court undermines the Court's confidence in Mr. Ratcliffe's testimony that he never advised Mr. Jackson that he had to proceed to trial to preserve the FSA issue. The Court is not, however, suggesting that Mr. Ratcliffe was in any way dishonest in his testimony at the evidentiary hearing. Rather, the Court simply doubts the reliability of Mr. Ratcliffe's memory of events and the advice he believes he gave to Mr. Jackson.

### 4

Weighed against the testimony of Mr. Ratcliffe is the testimony of Mr. Jackson and Mr. Kelly. Mr. Jackson was clear that having been advised that he had to proceed to trial to preserve his FSA issue, he did so. Under questioning by the prosecutor at the evidentiary hearing about Mr. Jackson's ability to enter an open, or blind, plea, and thereby still preserve the FSA issue, Mr. Jackson was clearly confused regarding his ability to do so, further supporting his testimony that he believed he could only preserve his FSA issue by going to trial.

Although the undisputed testimony establishes that Mr. Jackson learned on February 25, 2011 that Mr. Kelly intended to plead guilty and preserve his FSA issue, he also testified that when he brought this fact to Mr. Ratcliffe's attention, he again advised Mr. Jackson that he did not believe he could preserve the issue in a plea agreement. (Tr. 19). Mr. Ratcliffe's testimony regarding the conversation was only that he was aware Mr. Kelly was entering a conditional plea and that "others have pleas on their cases, depending upon who they are

20

and the facts of their case and what they want to do." (Tr. 69). When combined with Mr. Ratcliffe's admitted lack of knowledge concerning conditional pleas, and his failure to even read Mr. Kelly's plea agreement, this testimony is not necessarily inconsistent with Mr. Jackson's version of events.

The most problematic issue with Mr. Jackson's version of events is his numerous letters to Judge McCuskey. In none of those letters does Mr. Jackson ever mention the FSA or his desire to preserve the issue for appeal. At first blush, one would expect some reference in those letters to the FSA, given the issue's alleged importance in Mr. Jackson's decision to proceed to trial, rather than enter a plea. However, when viewed in the proper context, the failure of Mr. Jackson to mention the FSA in his letters is unremarkable. Mr. Jackson's claim in this case is that he *relied* upon his counsel's incorrect advice about proceeding to trial to preserve his FSA issue. If Mr. Jackson believed at the time that advice was *correct* as he claims, he would have no reason to complain about that advice to Judge McCuskey.

Indeed, this reliance on that advice also explains his insistence on going to trial and his complaints about Mr. Ratcliffe's attempts to persuade him to enter a plea. If he believed, based upon his counsel's incorrect advice, that he could only preserve an FSA issue by going to trial and he wished to preserve that issue, then he would naturally insist on his right to trial. Likewise, there is nothing inconsistent between Mr. Jackson's claim in this case and his insistence in his letters to Judge McCuskey and Mr. Ratcliffe on a vigorous defense at trial. Having made the decision to go to trial, even if it was solely for the purpose of preserving the FSA issue, does not mean that Mr. Jackson had to concede his guilt at trial. In other words, neither Mr. Jackson's failure to mention the FSA in his letters nor his insistence upon a vigorous defense undermine his claims regarding the incorrect advice he claims to have received.

21

**5**

Weighing the exhibits and all of the testimony presented at the hearing, as explained, *supra*, the Court concludes that the evidence supports a finding that Mr. Ratcliffe incorrectly advised Mr. Jackson that he had to proceed to trial to preserve an argument for appeal that the FSA applied to him. Such advice constitutes deficient performance, given that both an open plea and a plea agreement pursuant to the policy of the U.S. Attorney's Office in the Central District of Illinois would have also preserved the issue for appeal, as evidenced by the conditional plea of Mr. Jackson's own co-defendant, Mr. Kelly.

**C**

It is not enough, however, for a petitioner to establish deficient performance; he must also establish a "reasonable probability" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Galowski*, 78 F.3d at 694. In the context of a claim of deficient performance which caused a defendant to proceed to trial, rather than enter a guilty plea, the petitioner "must show that but for the ineffective advice of counsel there is a reasonable probability that [a] plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385, 182 L. Ed. 2d 398 (2012). Mr. Jackson has established prejudice under this standard.

The Court has already found Mr. Jackson's claim that he proceeded to trial on incorrect advice in order to preserve the FSA issue for appeal to be credible.

Had Mr. Jackson properly understood that he could have preserved the FSA issue in either an open plea or a plea agreement, there is a "reasonable probability" that he would have elected to plead guilty, rather than go to trial. *Galowski,* 78 F.3d at 694. True, such a difference in outcome is not certain, for Mr. Jackson may have had other motives to proceed to trial as well; but certainty is not required, only a "reasonable probability." This reasonable probability is also supported by the fact the Mr. Jackson had, in prior prosecutions in state court, in every instance pleaded guilty; only in this case did he insist on a trial. (Tr. 43). This at least demonstrates that Mr. Jackson was not predisposed to always put the prosecution to the test by going to trial.

Regarding the other factors noted in *Lafler,* Mr. Jackson easily satisfies them. First, there is no dispute that the government suggested a plea to the bottom of the guideline range, *i.e.* 262 months. Had this offer resulted in a plea agreement, there is no question that such agreement would have included a clause allowing for the preservation of the FSA, as it was the policy of the U.S. Attorney's Office to include such an exception to a general sentencing appeal waiver. Moreover, given that Judge McCuskey accepted a similar plea from co-defendant Kelly and, indeed, extended the time for Mr. Jackson to receive the additional 1-level reduction for the timely acceptance of responsibility, U.S.S.G. § 3E1.1(b), after Mr. Kelly pleaded guilty (See Docket in 2:10cr20038, 4/11/2011 Minute Entry), there is good reason to believe that Judge McCuskey would have accepted such a plea and reduced Mr. Jackson's offense level by three for acceptance of responsibility, just as he did in Mr. Kelly's case.

With a 3-level reduction for acceptance of responsibility, Mr. Jackson's guideline range at the original sentencing hearing would have been 262 to 327 months, rather than 360 months to life. (D. 62 at ECF p. 18). Then, after a remand for resentencing pursuant to the FSA and *Dorsey,* Mr. Jackson's range would

have been 188 to 235 months imprisonment.  (D. 34 at ECF pp. 18-19). Thus, even ignoring the variance from the bottom of his guideline range Mr. Jackson received at his post-*Dorsey* resentencing, a bottom of the range sentence would have been twelve months lower than the 200-month sentence he ultimately received. Accordingly, Mr. Jackson has demonstrated that his sentence would have been less severe by at least 12 months had he pleaded guilty and received an offense level reduction for acceptance of responsibility, and, consequently, he has also demonstrated prejudice.

## IV

There remains a question of remedy. The Supreme Court held in *Lafler* that a district court has a number of options when deciding upon the proper remedy for ineffective assistance of counsel which leads to a trial instead of a plea. *Lafler,* 132 S.Ct. at 1391. Among those options are "to vacate the convictions and resentence [petitioner] pursuant to [a] plea agreement, to vacate only some of the convictions and resentence respondent accordingly, or to leave the convictions and sentence from trial undisturbed."

In the present case, the appropriate remedy is to leave Mr. Jackson's convictions from trial undisturbed, vacate his sentence, and resentence him based upon his convictions after trial. The remedy Mr. Jackson seeks is the 3-level reduction in his offense level for acceptance of responsibility which he did not receive because he went to trial due to ineffective assistance of counsel. Consequently, it would make little sense and waste judicial resources to vacate his convictions, require the government to offer him a plea, have him accept it, have a change of plea hearing pursuant to Federal Rule of Criminal Procedure 11, and then resentence him, all for the sake of him receiving the 3-level offense level reduction before being resentenced. Rather, the sensible, efficient route to achieve the remedy Mr. Jackson seeks is to vacate his sentence only, reduce his

offense level by 3 for acceptance of responsibility, U.S.S.G. § 3E1.1(a)-(b), adjust his guideline range to 188 to 235 months, and resentence him based upon this guideline range and any other factors under 18 U.S.C. § 3553(a) the parties deem appropriate.[6]

**V**

For the foregoing reasons, the Court RECOMMENDS that Mr. Jackson's petition by GRANTED and that he be accorded the remedy set forth in Section IV, *supra*.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) calendar days after service of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on December 30, 2015

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE

---

[6] The Court notes that it advised the parties at the evidentiary hearing that, should it recommend a grant of Mr. Jackson's petition, it would give the parties an opportunity to brief the question of what the appropriate remedy would be in this case. However, in light of the flexibility accorded to district courts by the Supreme Court in *Lafler*, the Court believes such briefing is now unnecessary. Moreover, should a party disagree with the recommended remedy herein, said party will have the opportunity to brief that disagreement in an objection to this Report and Recommendation.